SETON HALL UNIVERSITY SCHOOL OF LAW
CENTER FOR SOCIAL JUSTICE
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700
Baher Azmy (BA 8406)

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7816
Lenora Lapidus (LL 6592)
Claudia Flores (CF 4932)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

_____X

BELETASHACHEW AYENACHEW CHERE,          :
                                        :          Index No.
            Plaintiff,                  :
                                        :
      vs.                               :
                                        :          **COMPLAINT**
FESSEHA TAYE and ALEMTASHAI GIRMA       :
                                        :          **JURY TRIAL**
Defendants.                             :          **DEMANDED**
                                        :
_____X


## <u>INTRODUCTION</u>

1.     In this action, Plaintiff Beletashachew Chere seeks damages from Defendants

Fesseha Taye and Alemtashai Girma (collectively Defendants) under federal law, including the

Fair Labor Standards Act and the Thirteenth Amendment to the United States Constitution; state

law, including the New Jersey minimum wage and overtime laws and New Jersey tort law; and

international law, including treaty and customary international law prohibitions against

trafficking in persons, enslavement, involuntary servitude, and forced labor.

2.      Defendants induced Ms. Chere to come to the United States from Ethiopia through fraudulent means and then held her as an involuntary servant for almost one and a half years.  During this time, Defendants forced Ms. Chere to work in their home for as many as one hundred hours per week without pay.  Defendants kept Ms. Chere in a condition of involuntary servitude and forced labor through threats of serious harm to her person and well-being and through a pattern of behavior that caused Ms. Chere to reasonably believe that harm would come to her if she failed to continue performing the household duties assigned by Defendants or if she otherwise reported Defendants' conduct to responsible authorities.  Ms. Chere was finally able to escape Defendants' home with the assistance of acquaintances and family.

3.      Defendants' actions violated the Thirteenth Amendment to the United States Constitution and federal statutes prohibiting involuntary servitude; international law, including treaties, conventions, and customary international law prohibiting enslavement, forced labor and trafficking in persons actionable pursuant to the Alien Tort Statute, 28 U.S.C. § 1350; the minimum wage requirements of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*; New Jersey Wage Payment Law, N.J.S.A. §§ 34:11-4.1 *et seq.*; the New Jersey Wage and Hour Law, N.J.S.A. §§ 34:11-56a *et seq.*; and the New Jersey Wage and Hour Regulations, N.J.A.C. §§ 12:56 *et seq.*  Ms. Chere also alleges intentional infliction of emotional distress, fraud, misrepresentation, unjust enrichment, and conversion.

## PARTIES

4.      Plaintiff Beletashachew Chere, a citizen of Ethiopia, resides in Chicago, Illinois.

5.      Upon information and belief, Defendants Taye and Girma, husband and wife, reside at 95 South Valley Road, West Orange, New Jersey.  Upon information and belief, Defendant Girma is employed at the United Nations Development Project.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1332, 1350 and 29 U.S.C. § 216(b).  This Court has supplemental jurisdiction over Ms.

Chere's state law claims pursuant to 28 U.S.C. § 1367.

7.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), because the

events that give rise to this action occurred within this district and Defendants reside within this

district.

## FACTUAL ALLEGATIONS

### Circumstances Leading to Ms. Chere's Employment with Defendants

8.     Ms. Chere was born on or about February 25, 1974 in Addis Ababa, Ethiopia.

9.     Ms. Chere began working full-time to support her parents and four younger

siblings after she finished the tenth grade.

10.     In or about November 2001, Ms. Chere's aunt, Yesharg Taye, asked her if she

would be willing to work abroad to help her family.  At her aunt's suggestion, Ms. Chere agreed

to meet with Defendant Girma to discuss possible employment abroad.

11.     Defendant Girma hired Ms. Chere as a caretaker for her son, Kaleb, for a two

week trial period in Ethiopia and, after that period, offered Ms. Chere a position as her employee

in her New Jersey home.

12.     Ms. Taye and Defendant Girma negotiated the terms and conditions of Ms.

Chere's employment.  Defendant Girma offered Ms. Chere employment in the United States on

the following terms:

A.     Ms. Chere would work for Defendants for three years in the United States;

B.     Ms. Chere would be paid a salary of $100 per month;

3

      C.      Defendants would pay for Ms. Chere's travel to and from New York;

      D.      Ms. Chere's sole responsibilities would be:

           i.  to care for Defendant Girma's son, Kaleb, and

           ii.  to cook Ethiopian food twice a week for Defendants;

      E.      Ms. Chere would be able to speak freely to her family in Ethiopia by telephone and attend English language classes while working for Defendants, at Defendants' expense; and

      F.      Defendants would provide Ms. Chere clothes appropriate for New Jersey weather.

13.      Defendants' representations regarding the conditions of Ms. Chere's employment were false.

14.      Defendants knew these representations to be false at the time they were made. Defendants made these misrepresentations for the purpose of inducing Ms. Chere to accept Defendants' offer to work for them in the United States.  Defendants did not intend to honor such representations.

15.      In or about December 2001, in reliance upon the promises made by Defendant Girma, Ms. Chere accepted this offer of employment.

16.      Ms. Chere's travel arrangements were made by Defendant Girma's brother-in-law, Moggas Taye.  He prepared the necessary travel documents, purchased a plane ticket for Ms. Chere, and escorted her to the airport in Ethiopia.  Mr. Taye instructed an acquaintance of Defendants who was also traveling on the same plane as Ms. Chere to assist her.

17.      In or around the first or second week of January 2002, Ms. Chere arrived in New Jersey to begin her employment with Defendants.

18.     Upon arrival, Defendants took Ms. Chere's documents, including her passport, and told her they would be kept at the United Nations Development Project.  Her documents were never returned to her.

19.     Contrary to Defendants' representations, Defendants forced Ms. Chere to work without any pay and enforced this requirement through threats of serious harm to her person and a pattern of mental, physical and legal coercion.

<u>Ms. Chere's Employment Responsibilities</u>

20.     Upon her arrival, Defendants required Ms. Chere to do far more work and take on far more employment responsibilities than what they agreed to in Ethiopia.

21.     Ms. Chere was required to work approximately eighteen hours a day, seven days a week.  Her day began around 5:30 a.m. and ended around 11:30 p.m.  In addition to providing primary care for Defendants' son, Ms. Chere was required to serve as a domestic worker, cleaning and maintaining the home, serving meals throughout the day to all the family members, and providing personal assistance to Defendant Girma.

22.     Ms. Chere served as Kaleb's primary caretaker.  Her childcare responsibilities included, but were not limited to, bathing him, feeding him all meals, taking him to the bathroom and teaching him how to use the bathroom, changing his clothes, putting him down to sleep, and playing with him.

23.     Ms. Chere's daily household duties included, but were not limited to, sweeping and dusting the house, making the beds, straightening up bedrooms, cleaning the bathrooms and upstairs hallways, and cleaning the kitchen.

24.     On a weekly basis, Defendants required Ms. Chere to clean the garage and wash the entire family's laundry.

25.     Ms. Chere was expected to cook throughout the day and evening.  She made and served breakfast to the family at various points in the morning because each family member ate breakfast at a different time.  In addition to making lunch for Kaleb, Ms. Chere prepared and served lunch to Moggas Taye, who was living in Defendants' house, and Defendant Taye, who often worked from home.  Most nights, she was expected to make Ethiopian dinners, which required laborious preparation.  She also made "injera", Ethiopian bread, and Ethiopian coffee on a regular basis.

26.     After serving and cleaning up after dinner, Ms. Chere served tea to the family, washed the dishes, made an oral daily report of her activities, and took the garbage out.

27.     Ms. Chere was also expected to wait on Defendants' friends when they visited the house.

28.     In addition to Ms. Chere's household and childcare duties, Defendant Girma required that Ms. Chere provide her with personal services.  In the mornings, in addition to preparing Kaleb for school and making breakfast for the family, Ms. Chere was also responsible for waking Defendant Girma.   Defendant Girma required Ms. Chere to assist her in getting dressed.  This typically involved Ms. Chere taking out and putting away several outfits for Defendant Girma.  During these sessions, Defendant Girma often told Ms. Chere not to touch Defendant Girma's skin when she helped her get dressed because Ms. Chere was "a dirty thing."

29.     Often on weekends, Ms. Chere was required to accompany Defendants shopping.  In addition to caring for Kaleb, Defendant Girma required Ms. Chere to carry Defendant Girma's purse and bags during the shopping excursions.  Defendant Girma often became very irritable and abusive during these trips.

30.     On Sundays, Defendants often went out with Kaleb in the afternoon until 5:00 p.m.  Ms. Chere was permitted to rest in the house as long as she finished cleaning the house first.  Because cleaning took most of the day, however, she was rarely able to find time to rest before Defendants returned from their outing.

Compensation

31.     Ms. Chere was never paid for any of the work she performed for Defendants.  In failing to pay Ms. Chere, Defendants violated minimum wage provisions of federal and New Jersey law and the overtime provision of New Jersey law.

32.     Upon information and belief, Defendants knowingly, willfully and intentionally violated the minimum wage and overtime provisions of the Fair Labor Standards Act and New Jersey state law.

33.     Upon information and belief, Defendants failed to keep, maintain, and preserve truthful and accurate records of the hours that Ms. Chere worked and the wages paid to her.

34.     Defendants employed Ms. Chere, and Ms. Chere was Defendants' employee, within the meaning of the Fair Labor Standards Act and New Jersey state law.

Conditions of Ms. Chere's Employment

35.     Ms. Chere was required to sleep on a thin mat on the floor in Kaleb's room throughout the length of her employment.  During the last nine months of this period, no rug covered the hardwood floors on which she slept.  Every night, Ms. Chere rolled out her mat and covered herself with the *gabi* (light blanket) she had brought with her from Ethiopia, because Defendants did not provide other bedding.  Each morning she was required to roll-up the mat and put it away.

36.     In early 1999, Defendants bought a second bed for Kaleb's room but continued to require Ms. Chere to sleep on the floor.

37.     Ms. Chere kept the few belongings she had brought with her in a small space in Kaleb's closet.

38.     Ms. Chere ate during brief breaks from work.  Unless there was food left over from the meal she prepared for the family, she ate only bread and tea.  During her employment with Defendants, Ms. Chere lost substantial weight as a result of not receiving proper nutrition.

39.     Further, Defendant Girma required that even during the winter Ms. Chere keep all windows in the kitchen open while she was cooking so that the house would not smell of Ethiopian food, thus making Ms. Chere's work area very cold.

Denial of Access to Medical Care

40.     When Ms. Chere fell ill, Defendants denied her medical treatment and refused to take her to see the doctor despite repeated requests.  On several occasions, especially during the winter, Ms. Chere developed flu-like symptoms that lasted weeks at a time, but she was told to continue working.  Without knowledge of English or how to access medical care in the United States, Ms. Chere went without treatment.

41.     Around the end of March or beginning of April 2003, Kaleb bit Ms. Chere on the cheek.  Despite painful swelling that developed around her cheek, Defendant Girma mocked her and refused to allow her to seek medical treatment.   Ms. Chere continues to have a scar on her face from the incident.

42.     Ms. Chere also began suffering from persistent and severe headaches for which she was not permitted to seek treatment.  Defendant Girma simply directed her to take Advil in

an effort to control her painful headaches while she was working.  By prohibiting Ms. Chere

from seeking treatment, Defendants prolonged her suffering.

<u>Physical, Sexual and Mental Abuse</u>

43.     In the fall or winter of 2002, Defendant Taye called Ms. Chere into his room and

ordered her to massage his back, which he said was sore.

44.     Approximately one week later, Defendant Taye again ordered Ms. Chere to

massage his back but this time he told her to take off his pajamas and "go lower."   He lifted his

legs to touch her breast with his foot.  While Ms. Chere massaged his back, Defendant Taye

ejaculated on his blanket.  Ms. Chere was horrified and afraid so she left the room.

45.     On four or five subsequent occasions, Defendant Taye required her to "massage"

him in this same manner.  Ms. Chere was unable to refuse because she was frightened of the

Defendants.

46.     Defendant Girma's behavior towards Ms. Chere was verbally and psychologically

abusive.  Defendant Girma regularly told Ms. Chere she was "stupid" and insulted her in

Amheric, saying things such as, "You dirty thing, where can you go?  You have nowhere to go!"

and "Get out of my face!"

47.     Defendant Girma repeatedly told Ms. Chere, "you are my punching bag - the one

on which I can take out my anger and you have nowhere to go."

48.     The conditions of Ms. Chere's employment were so intolerable that on several

occasions Ms. Chere begged Defendants to send her back to Ethiopia, but Defendants simply

ignored her.

49.   Defendants' treatment of Ms. Chere caused her to consider suicide towards the end of her employment.  Because she found herself thinking about such extreme measures, she realized that, although she was afraid, she would have to find a way to escape.

<u>Enforced Isolation</u>

50.   Defendants prohibited Ms. Chere from speaking to anyone outside of Defendants' immediate family.

51.   When Defendants had guests over, they prohibited Ms. Chere from speaking to them and required her to stay in Kaleb's room unless she was needed to serve the guests.

52.   Defendants prohibited Ms. Chere from using the telephone for any reason other than contacting Defendant Girma.  She was also not allowed to answer the telephone when the family was not home.

53.   When Defendant Girma wished to contact Ms. Chere at the home, she would call the separate fax line which Ms. Chere was specifically permitted to answer for this purpose.

54.   Defendants prohibited Ms. Chere from having contact with her family in Ethiopia. She was prohibited from calling them or taking their calls.  She was not allowed even to call her family to notify them that she had arrived safely in the United States.

55.   Ms. Chere's family made repeated attempts to contact her at Defendants' home, but when they asked to speak to her, their calls were disconnected.

56.   On one occasion in which Ms. Chere's cousin attempted to call her, Ms. Chere answered the phone, as she was permitted to do when the family was home.  Ms. Chere was too afraid to tell her cousin how poorly she was treated because Defendant Taye was listening in on the conversation.  Fortunately, the strain of Ms. Chere's voice alerted her cousin to the situation and her cousin stated that her family in Ethiopia would try to help her.

57.    After Ms. Chere spoke to her cousin on this occasion, Defendant Girma instructed her to write a letter to her family asking them not to call or write her letters anymore.   Although Ms. Chere did so, her concerned family continued to attempt to contact her.

58.    Although Ms. Chere wrote numerous letters to her family in the first several weeks of her employment and asked Defendant Girma to send them for her, her family received none of her letters.  Later when they did receive a letter, it was marked "received open."

59.    During her employment with Defendants, Defendants prohibited Ms. Chere from leaving the house.

60.    Defendant Girma told her if she went outside alone she would be in great danger and people would harm her.  As a result, Ms. Chere was too afraid to leave the house alone.

61.    Despite being very religious, Ms. Chere was only permitted to attended church twice during the time she lived in the Defendants' home, both times under the family's supervision.

62.    Ms. Chere was so afraid and isolated that even when she once saw a police car near Defendants' home, although she wanted to run out and tell them what was happening to her, she did not do so because she knew she could not communicate with them and she was afraid of what would happen if Defendants found out.

63.    Defendants monitored Ms. Chere's communications and her actions for the purpose of preventing her from leaving their home and to prevent her from seeking the assistance of others.

<u>Threats and Coercion</u>

64.    Defendant Girma often threatened Ms. Chere that if she did not behave Defendant Girma would have her deported to Ethiopia without pay.

65.     On various occasions Defendant Girma told Ms. Chere in Amheric:

    A.     "You are my property now. You cannot go anywhere."

    B.     "Tears won't help you."

    C.     "I can have you deported to Ethiopia without paying you anything."

66.     Defendants held Ms. Chere's passport and other documents for the entire length of her employment.  To the best of Ms. Chere's knowledge, Defendants continue to hold her documents.

67.     Consistent with Defendants' threats against Ms. Chere, when Ms. Chere was finally able to escape from Defendants, they brought a frivolous criminal charge against her, alleging that she stole from them.  The charge was dismissed by the court, but only after Ms. Chere was required to defend herself in a full trial.  The case was dismissed after trial for failure of proof.

68.     Upon information and belief, Defendants brought the criminal action against Ms. Chere in retaliation for her having revealed the conditions of her employment to authorities and for requesting that she be paid for her work.

Escape from Defendants

69.     In March 2003, Ms. Chere received a letter from her family containing the phone number of her maternal uncle who lived in Chicago.  One day, when the family was away, Ms. Chere called him on the fax line.  His mother-in-law answered and Ms. Chere explained her situation briefly.  Despite the mother-in-law's offer to help, Ms. Chere requested that she not contact her because she was afraid of what would happen if Defendants discovered the communications.  Ms. Chere told her she would call again when she could.

70.     On or about April 5, 2003, when Defendants took a weekend trip to Washington D.C. and left Ms. Chere home with Moggas Taye, Ms. Chere called her uncle's house again while Mr. Taye was sleeping.  Her uncle immediately arranged for a local friend who drove a cab to pick her up.  Ms. Chere left the house shortly afterward with her few belongings.  Ms. Chere stayed with the family friend while her uncle drove from Chicago to New York to pick her up.  He then drove her to Chicago where she remains today.

**COUNT ONE**
**INVOLUNTARY SERVITUDE**
**U.S. CONSTITUTION AND FEDERAL STATUTES**

71.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

72.     Ms. Chere brings this claim for relief under the private cause of action implied under the Thirteenth Amendment to the United State Constitution, 42 U.S.C. § 1994, and 18 U.S.C. §§ 1581, 1584.

73.     As alleged herein, Defendants used threats of physical harm and mental, physical, and legal coercion to induce Ms. Chere to work against her will and required her to work without the pay required by law.  This condition, given her special vulnerabilities, caused her to reasonably believe that she had no alternative but to continue her service.

74.     Defendants committed the acts alleged herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Ms. Chere, from an improper and evil motive amounting to malice, and in conscious disregard of Ms. Chere's rights.

75.     Through such actions, defendants, acting individually and in concert, created and enforced a system of involuntary servitude prohibited by the Thirteenth Amendment to the United States Constitution, 42 U.S.C. § 1994, and 18 USC §§ 1581, 1584.

76.     As a direct and proximate result of these actions, Ms. Chere has sustained

damages, including physical injury, emotional distress, and economic losses, entitling her to

damages in an amount to be determined at trial.

**COUNT TWO**
**TRAFFICKING**
**ALIEN TORT STATUTE**

77.     Ms. Chere realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

78.     Defendants induced Ms. Chere to accept employment with them in the United

States through fraud and deception for the purposes of subjecting her to a condition of

involuntary servitude and forced labor.

79.     Such acts constitute trafficking in violation of the law of nations under the Alien

Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting

trafficking as reflected, expressed, and defined in multilateral treaties and other international

instruments, international and domestic judicial decisions and other authorities including inter

alia the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. GAOR, 3rd Sess.,

art. 4, U.N. Doc. A/810 (1948); International Covenant on Civil and Political Rights, Dec. 16,

1966, art. 8, 999 U.N.T.S. 171, 6 I.L.M. 360, 371; the International Convention to Suppress the

Slave Trade and Slavery, Sept. 25 1926, 46 Stat. 2183, 60 L.N.T.S. 253; the Supplementary

Convention on the Abolition of Slavery, the Slave Trade, and Institutions and Practices Similar

to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; the Convention Concerning Forced or

Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; the Convention Concerning the Abolition of

Forced Labour, June 25, 1957, 320 U.N.T.S. 291; the Convention on the Elimination of All

Forms of Discrimination Against Women, December 18, 1979, art. 6, 1249 U.N.T.S. 13, 19

I.L.M. 33, 37; the *Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime,* G.A. Res. 55/25, Annex II, U.N. GAOR, U.N. Doc. A/45/49 (2001); and the Trafficking Victims Protection Act, 18 U.S.C. § 1589 (2004).

80.     As a direct and proximate result of these actions, Ms. Chere has sustained damages, including physical injury, emotional distress, and economic losses, entitling her to damages in an amount to be determined at trial.

**COUNT THREE**
**SLAVERY, SLAVERY-RELATED PRACTICES AND FORCED LABOR**
**<u>ALIEN TORT STATUTE</u>**

81.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

82.     Defendants knowingly obtained Ms. Chere's labor by means of threats of serious harm to her person, as well as by means of mental, physical, and legal coercion. Through their actions, Defendants created and enforced a pattern of behavior intended to cause Ms. Chere to believe that if she did not perform such labor or services, she would suffer serious harm.

83.     Such acts constitute slavery, slavery-related practices, enslavement and forced labor in violation of the law of nations under the Alien Tort Statute, 28 U.S.C. § 1350, in that the acts violated customary international law prohibiting forced labor, slavery-related practices, enslavement and slavery as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions and other authorities including inter alia the Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. GAOR, 3rd Sess., art. 4, U.N. Doc. A/810 (1948); International Covenant on Civil and Political Rights, Dec. 16, 1966, art. 8, 999 U.N.T.S. 171, 6 I.L.M. 360, 371; the International Convention

to Suppress the Slave Trade and Slavery, Sept. 25 1926, 46 Stat. 2183, 60 L.N.T.S. 253; the

Supplementary Convention on the Abolition of Slavery, the Slave Trade, and Institutions and

Practices Similar to Slavery, Sept. 7, 1956, 18 U.S.T. 3201, 266 U.N.T.S. 3; the Convention

Concerning Forced or Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; the Convention

Concerning the Abolition of Forced Labour, June 25, 1957, 320 U.N.T.S. 291; the Convention

on the Elimination of All Forms of Discrimination Against Women, December 18, 1979, art. 6,

1249 U.N.T.S. 13, 19 I.L.M. 33, 37; the *Protocol to Prevent, Suppress, and Punish Trafficking in*

*Persons, Especially Women and Children, Supplementing the United Nations Convention*

*Against Transnational Organized Crime,* G.A. Res. 55/25, Annex II, U.N. GAOR, U.N. Doc.

A/45/49 (2001); and the Trafficking Victims Protection Act, 18 U.S.C. § 1589 (2004).

84.     As a direct and proximate result of the actions described herein, Ms. Chere has

sustained damages, including physical injury, emotional distress, and economic losses, entitling

her to damages in an amount to be determined at trial.

**COUNT FOUR**
**<u>FAIR LABOR STANDARDS ACT VIOLATIONS</u>**

85.     Ms. Chere realleges and incorporates by reference each and every allegation

contained in the preceding paragraphs as if set forth fully herein.

86.     Defendants employed Ms. Chere within the meaning of the Fair Labor Standards

Act, 29 U.S.C. § 203(d).

87.     Defendants willfully refused to pay Ms. Chere minimum wages, in violation of 29

U.S.C. §§ 206(a), (f) and the U.S. Department of Labor regulations.

88.     Defendants' willful violations of the Fair Labor Standards Act entitle Ms. Chere

to recovery of her unpaid minimum wages for an amount no less than $41,715.00, an equal

amount as liquidated damages and reasonable attorneys' fees and costs of the action to be

determined by the court, pursuant to 29 U.S.C. § 216(b), and the U.S. Department of Labor regulations, in addition to declaratory relief.

## COUNT FIVE
## NEW JERSEY STATE MINIMUM WAGE AND OVERTIME VIOLATIONS

89.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

90.     Defendants intentionally and willfully failed to pay and refused to pay Ms. Chere minimum wages, in violation of New Jersey Wage Payment Law, N.J.S.A. § 34:11-4.7, the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56a, and the New Jersey Wage and Hour Regulations, N.J.A.C. § 12:56-1.2(a)6, from commencement of her employment as a domestic worker in or about January 2002, until approximately April 5, 2003.

91.     Defendants also intentionally and willfully failed and refused to pay Ms. Chere overtime wages in violation of New Jersey Wage Payment Law, N.J.S.A § 34:11-4.1 et seq., the New Jersey Wage and Hour Law, N.J.S.A. § 34:11-56a4, and the New Jersey Wage and Hour Regulations, N.J.A.C § 12:56-6.1, from the commencement of her employment in or about January 2002 until approximately April 5, 2003.

92.     Defendants' willful violations of New Jersey labor law entitle Ms. Chere to recovery of her unpaid minimum wage in an amount no less than $13,390.00, overtime wages in an amount no less than $42,515.00, reasonable attorneys' fees and costs of the action to be determined by the court, plus interest.

## COUNT SIX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

93.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

94.     During the course of Ms. Chere's employment, Defendants intentionally and recklessly harassed and inflicted emotional injury on Ms. Chere by subjecting Ms. Chere to outrageous treatment beyond all bounds of decency.  Defendants verbally, mentally and physically abused Ms. Chere and treated her in a demeaning and inferior manner, which no reasonable person could be expected to endure.

95.     As a direct and proximate result of these actions, Ms. Chere has sustained damages to be determined at trial as well as punitive damages stemming from Defendants' malicious acts and conscious wrongdoing.

**COUNT SEVEN**
**CONVERSION**

96.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

97.     Upon employment, Defendants retained possession of Ms. Chere's passport and immigration documents, which they continue to possess unlawfully.

98.     Ms. Chere demands the immediate return of her passport and other documents from Defendants.

**COUNT EIGHT**
**LEGAL MISREPRESENTATION/FRAUD**

99.     Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

100.    Defendants intentionally and knowingly misrepresented to Ms. Chere the scope and conditions of her employment and duties as a domestic servant for the Defendants, and the amount of wages that Ms. Chere would receive for her employment.  To induce Ms. Chere to accept employment with them, Defendants made promises concerning Ms. Chere's future

employment duties, compensation, living conditions and work conditions while knowing these promises were false and would not be fulfilled.

101.    Defendants made the above misrepresentations with the intention that Ms. Chere rely on such in order to entice Ms. Chere to work as a domestic servant in Defendants' household.

102.    As a direct and proximate result of these actions, Ms. Chere has sustained damages to be determined at trial.

## COUNT NINE
## UNJUST ENRICHMENT

103.    Ms. Chere realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

104.    Ms. Chere rendered services as a live-in domestic servant to Defendants in expectation of compensation for such services.

105.    Defendants accepted these services and in turn failed to compensate Ms. Chere for the fair market value of her services.

106.    Defendants have been unjustly enriched at the expense of Ms. Chere.

107.    As a result, Ms. Chere has been damaged in an amount to be determined at trial, plus interest.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that judgment be granted as follows:

    A.  Declaratory judgment;

    B.  Money damages in the amount sought for each Claim for Relief plus interest;

    C.  Return of Plaintiff's possessions unlawfully kept;

D.  Attorney's fees and costs plus interest, pursuant to U.S.C. § 216(b) and N.J.S.A. §

34:11-56a25;

E.  Such other and further relief as this Court may deem just and proper.

Plaintiff demands a trial by jury.

Dated:  Newark, New Jersey
        December 20, 2004

SETON HALL UNIVERSITY SCHOOL OF LAW
CENTER FOR SOCIAL JUSTICE
833 McCarter Highway
Newark, NJ 07102
(973) 642-8700

By       /s/ Baher Azmy_____
        Baher Azmy (BA 8406)

AMERICAN CIVIL LIBERTIES UNION
OF NEW JERSEY
P.O. Box 750
89 Market Street, 7th Floor
Newark, New Jersey 07101
(973) 642- 2084
Edward Barocas (EB 8251)

AMERICAN CIVIL LIBERTIES UNION
FOUNDATION WOMEN'S RIGHTS PROJECT
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7816
Lenora Lapidus (LL 6592)
Claudia Flores (CF 4932)

CITY UNIVERSITY SCHOOL OF LAW
MAIN STREET LEGAL SERVICES INTERNATIONAL
WOMEN'S HUMAN RIGHTS CLINIC
65-21 Main Street
Flushing, New York 13367
(718) 575-4202
Andrew Fields (AF 7795)

*Attorneys for Plaintiff Beletashachew Chere*